NOTICE

Decision filed 07/14/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250249-U

NO. 5-25-0249

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 17-CF-1575 |
| | ) | |
| CHARLES L. FITZPATRICK, | ) | Honorable |
| | ) | Rodney S. Forbes, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Hackett and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The second stage dismissal of defendant's postconviction petition is affirmed where defendant's appellate counsel was not ineffective for failing to raise a sufficiency of the evidence argument on direct appeal and defendant's claim of actual innocence was insufficiently supported.

¶ 2    Defendant, Charles L. Fitzpatrick, appeals the second stage dismissal of his postconviction petition. On appeal, defendant contends that he made a substantial showing that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence. He further contends that his petition made a colorable claim of actual innocence. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On October 25, 2017, defendant was charged with attempt (first degree murder) in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2010)),

1

aggravated battery with a firearm in violation of section 12-4 of the Code (*id.* § 12-4), aggravated discharge of a firearm in violation of section 24-1.2(a)(2) of the Code (*id.* § 24-1.2(a)(2)), and two counts of unlawful possession of a weapon by a felon in violation of section 24-1.1(a) of the Code (*id.* § 24-1.1(a)).

¶ 5    The case proceeded to a jury trial on the counts of attempted first degree murder and aggravated battery with a firearm. The evidence adduced at trial revealed that on October 16, 2017, Rafael Graham, a 70-year-old man, was driving his car home after running errands. Around 6:15 p.m., Rafael turned north on Monroe Street and saw a group of people in the middle of the street. As he got closer to the group, Rafael slowed down and tried to maneuver around the people despite individuals getting in front of his car. He heard a loud noise and saw that his passenger-side mirror was broken. He drove a bit further and stopped his car.

¶ 6    After he stopped the vehicle, Rafael heard a tapping on his passenger window. Rafael rolled down the window and encountered a man that was crouched down and leaning his head and chest toward the window. The man contended that Rafael hit him with his car and Rafael suggested they call 911. The man was indifferent as to whether Rafael called 911 and then told Rafael that "you f*** up and you going to pay." Rafael advised the man that he did not have any money. Thereafter, four gunshots were fired with three of the bullets striking Rafael on his right side. Rafael stated that he heard the gunshots and saw the man run away.

¶ 7    Rafael provided a description of the suspect when he was interviewed at the hospital immediately after the shooting. Rafael described the suspect as 5'9" to 5'10" with a medium build, dark-skinned Black male, in either his 20s or 30s. Neither Rafael, nor the officer he spoke to, could remember if Rafael stated that the suspect had facial hair and wore glasses. Rafael identified defendant as the person leaning into his car when the shots were fired, during the police-conducted

2

photo lineup four days after the shooting and, at that time, stated he was 70 to 80% sure of his identification. At trial, Rafael testified that he was 100% sure that defendant was the person leaning into his car on the day of the shooting and was 100% sure during the lineup but did not think the police would believe him if he used that percentage during the lineup. Rafael stated that he looked directly at defendant's face when he was leaning into the car and defendant was only a few feet from Rafael at that time.

¶ 8    Christina Anderson testified that she lived in the house across the street from where the shooting occurred. Prior to the shooting, Christina was walking from her car to her house. Her son was sitting on the porch. Christina identified defendant as the person who was leaning into Rafael's passenger-side window immediately before the shots were fired. She stated that defendant was facing her house when he was leaning on Rafael's car and looked at her for 30 seconds to a minute before bending down to the passenger-side window of the car. Christina's house was approximately 75 feet away from where the suspect was standing and it was a clear sunny day.

¶ 9    Christina provided a description to the police of the suspect immediately after the incident. She stated that the suspect was a dark-complected Black male between 35 and 40 years old with a "fade" haircut and no facial hair. In an interview with police two days later, Christina described the suspect as a Black male, dark-complected, with a stocky muscular build and a fade haircut. Christina viewed a photo lineup four days after the incident. She narrowed her choice to two photographs, one of which was defendant. Ultimately, Christina chose the photograph that was not defendant and told the officers that her certainty level was 60%. At trial, Christina explained that the two photographs were so similar she believed the men could be twins which created a dilemma for her during the photo lineup. Christina identified defendant as the suspect at trial and explained

3

that the identification was easier than looking at the photo lineup because she could see defendant's entire body at the trial.

¶ 10   Defendant's booking photograph, taken six days after the incident, stated that defendant was a Black male, with a dark brown complexion. He was listed as 27 years old, 5'11" tall, and weighed 202 pounds. In the photograph, defendant was wearing glasses and facial hair, that included a mustache and beard.

¶ 11   Additional evidence included GPS location data obtained from defendant's cell phone which placed defendant near the scene of the shooting. Testimony from defendant's parole officer and a representative of the electronic monitoring service company for defendant's ankle bracelet confirmed that defendant was out of his house at the time the shooting occurred and that defendant failed to attend two previously scheduled meetings with his parole officer, one on the evening of the shooting and the other, the following day. Internet searches and text messages sent after the shooting were found on defendant's cell phone and placed into evidence. The internet search was for "police scanner for my area." The text messages included the following statements: (1) "Had a situation that was serious"; (2) "DNT b mad"; (3) "I might [not] be living to much longer when it's my time don't be sad"; and (4) "Ain't no running got to get back to my old ways." No DNA or fingerprint evidence linked defendant to the crime.

¶ 12   Following the three-day jury trial in July 2018, defendant was found guilty of attempted first degree murder and aggravated battery with a firearm. The jury also found that defendant personally discharged the firearm that proximately caused great bodily harm to Rafael during the commission of the attempted first degree murder charge. Defendant was later sentenced to 30 years' imprisonment for attempted first degree murder with an additional 35 years' imprisonment for the use of a firearm during the commission of that offense for a total of 65 years' incarceration.

4

On direct appeal, defendant raised issues with both the conviction and his sentence. The judgment and sentence were affirmed. See *People v. Fitzpatrick*, 2021 IL App (4th) 180687-U, ¶ 55.

¶ 13    On September 20, 2021, defendant filed a *pro se* petition for postconviction relief. Therein, defendant contended that his rights under the fifth, sixth, and fourteenth amendments were violated. The petition contained two claims. The first alleged ineffective assistance of counsel where defendant's trial counsel failed to investigate, locate, or interview a witness, Lamonte Briggs, and failed to investigate, locate, and call Senica Givens to testify at trial to discuss the October 17, 2017, text message. The second claim was for ineffective assistance of appellate counsel for failing to raise issues related to trial counsel's ineffective assistance due to trial counsel's failure to locate, obtain, and investigate witnesses as well as appellate counsel's failure to raise issues related to the suggestive lineup, prosecutorial misconduct, and reasonable doubt. On October 18, 2021, the trial court docketed the petition and appointed counsel to represent defendant.

¶ 14    On November 19, 2021, defendant filed a *pro se* supplemental postconviction petition that added additional claims against trial counsel that included a failure to consult with defendant, a poor understanding of the case, failure to file pretrial motions, failure to present witnesses who would exonerate defendant, failure to provide adversarial testing of the State's case, failure to investigate and develop defendant's only plausible defense, and failures related to counsel's cross-examination of the State's witnesses. Defendant's second claim involved appellate counsel's failure to raise the issues about trial counsel and failure to raise a "dead bang winner" like reasonable doubt, prosecutorial misconduct, and inconsistent witness statements in the appeal. Defendant's third claim contended actual innocence and stated that witnesses existed, namely Lamonte Briggs, who could have exonerated defendant with an alibi defense. Defendant's fourth

5

claim contended that the cumulative effect of the ineffective assistance of counsel claims warranted reversal of the conviction.

¶ 15    On May 29, 2024, an amended petition for postconviction relief was filed by defendant's appointed counsel. The amended petition adopted the two previously filed postconviction petitions and reiterated defendant's claim of actual innocence and appellate counsel's decision not to argue that the State failed to prove defendant was guilty beyond a reasonable doubt. The amended petition was supported by defendant's affidavit and a November 30, 2023, notarized statement from Harry Hawkins Jr. that stated,

> "On October 16, 2017 I witness the incident that took place on that day with the shooting of Rafael Graham and that one had on involvement. I was on the corner of monroe and wagner talking with a friend of mine, when a group of guys wearing black hoodies were crossing monroe. As they were crossing I heard a loud noise like a crash and notice that one of the guys had been hit by the gray car. That same guy walked in the middle of monroe getting his shoe that was flying from under neath the car. He turn back towards the car where the rest of the group where surrounding the passenger side of the car. I saw one crossing monroe while the group were at the car. as one approached the group moved so one could walk by. One was bout two houses down when I heard gunshots, and saw the group of guys running away from the car. I didn't see who shot but I saw a short stocky guy run down the sidewalk with a gun in his hand and cut between some houses. One ran towards wagner going bout his business one had no involvement with the shooting or was he a part of the group."

A memorandum of law in support of the petition was also filed on May 29, 2024.

6

¶ 16    On July 31, 2024, the State moved to dismiss the petition. The motion indicated that on the first day of trial, defense counsel listed Lamonte Briggs as an alibi witness and told the court that multiple attempts to contact Briggs were unsuccessful. Later, after consulting with defendant, defense counsel advised the court that he was withdrawing the alibi defense. The State also argued that under the sufficiency of the evidence standard, the conviction would have been affirmed on appeal where two witnesses identified defendant as the perpetrator. The State contended that Hawkins's statement was not an affidavit and was therefore insufficient to support the actual innocence claim. It further argued that there were no allegations that the evidence was new, unknown to defendant at the time of the trial, or would not have been discoverable in the exercise of due diligence. The State noted that Hawkins's statement set forth no facts that could establish defendant's innocence because it did not allege that defendant was not at the scene or that someone other than defendant fired the shots. The State's motion also addressed defendant's specific allegations of ineffective assistance of trial and appellate counsel, as well as the claim of cumulative error.

¶ 17    A hearing was held on the State's motion to dismiss on March 20, 2025. As to the actual innocence claim, the State argued that there was no affidavit from Lamonte Briggs, which was sufficient to defeat the claim. The State also addressed defense counsel's statements at trial regarding the alibi defense that indicated counsel was never able to speak with the proposed witness. The State presented portions of the trial transcript in support of its position. The State also addressed the statement of Harry Hawkins and addressed the lack of allegations that this was new evidence or unknown to defendant at the time of the trial. It further argued that the evidence was not of such a clear and convincing nature that the outcome of the case would have been different, based on Hawkins's statements.

¶ 18    In response, postconviction counsel admitted that Hawkins's statement was not an affidavit but stated it was notarized and had to be taken as true at the second stage because nothing refuted the statement in the record. As to Briggs's availability, postconviction counsel stated that it was an "ongoing problem" trying to contact the alibi witness at trial and postconviction counsel also had difficulty reaching Briggs for defendant's postconviction petition.

¶ 19    Following argument, the court found there was no factual basis to support defendant's claim that appellate counsel should have raised a sufficiency issue. The court noted that the primary issue in the case was identification of the shooter. Two eyewitnesses identified defendant, and the eyewitness testimony was corroborated by electronic records. The court also stated that the evidence revealed that the person who was leaning into Rafael's vehicle was the shooter as indicated by the bullets and shell casings found in the car as well as the lack of any broken windows or bullet holes in the exterior of the car. As to the actual innocence claim, the court indicated that it would consider Hawkins's statement although it was not an affidavit but found that it did not rise to the level that would support a claim of actual innocence. The court noted that even taking Hawkins's statements as true, the affidavit did not present new, material, and noncumulative evidence that would potentially alter the jury's verdict. As such, the trial court dismissed the claims and defendant timely appealed.

¶ 20                                    II. ANALYSIS

¶ 21    "Under the Post-Conviction Hearing Act [(Act)], individuals convicted of criminal offenses may challenge their convictions on grounds of constitutional violations." *People v. Domagala*, 2013 IL 113688, ¶ 32 (citing 725 ILCS 5/122-1 *et seq.* (West 2010)). "The Act sets forth three stages of review." *Id.* During the first stage, the court determines if the petition is frivolous or patently without merit. *Id.* If it is not, the petition moves to the second stage. *Id.* ¶ 33.

8

"At the second stage, counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or answer the petition." *Id.* "At this stage, the circuit court must determine whether the petition and any accompanying documentation make a 'substantial showing of a constitutional violation.' " *Id.* (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). The constitutional claim may be based on ineffective assistance of counsel under the sixth amendment (see *id.* ¶ 47) or an actual innocence claim based on deprivation of life or liberty. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Only if a defendant makes the requisite showing of a constitutional violation will the postconviction petition advance to the third stage. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 22    The legal sufficiency of the postconviction petition is tested at the second stage. *Id.* ¶ 35. At this stage, "[a]ll well-pleaded facts that are not positively rebutted by the original trial record are taken as true." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). No evidentiary issues are addressed and "a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law." *Id.* We review dismissals of postconviction petitions *de novo*. *People v. Brown*, 2017 IL 121681, ¶ 24. This means that we perform the same analysis as the trial court (see *People v. Townsend*, 2023 IL App (1st) 200911, ¶ 82) and afford no deference to the trial court's conclusions. *People v. Morgan*, 2025 IL 130626, ¶ 22.

¶ 23    On appeal, defendant contends that his postconviction petition made a substantial showing of a constitutional violation in that his appellate counsel was deficient for failing to challenge the sufficiency of the evidence. He further contends that his postconviction petition provided a colorable claim of actual innocence based on Hawkins's affidavit. We address defendant's claim of ineffective assistance of counsel first.

¶ 24                          A. Ineffective Assistance of Counsel

¶ 25    "Both the United States Constitution and the Illinois Constitution guarantee criminal defendants the right to effective assistance of counsel." *People v. Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Const., amends. VI, XIV, and Ill. Const. 1970, art. I, § 8). In Illinois, claims of ineffective assistance of counsel are considered under the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007). The *Strickland* standard requires a defendant to show deficient performance and prejudice stemming from the deficient performance. *Id.* More specifically, a defendant must show that (1) the attorney's "performance was objectively unreasonable under prevailing professional norms" (*Domagala*, 2013 IL 113688, ¶ 36) and (2) absent the deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135. "[A] reasonable probability that the result would be different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 26    The same standard applies to appellate counsel. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Therefore, a defendant who contends appellate counsel rendered ineffective assistance due to a failure to raise an issue on appeal must show that (1) the failure to raise an issue on appeal was objectively unreasonable and (2) the decision not to raise the issue prejudiced the defendant. *Id.* If the underlying issue that was not appealed had no merit, a defendant suffers no prejudice. *Id.*

¶ 27    Defendant contends that appellate counsel's failure to raise a sufficiency of the evidence claim on appeal equated to ineffective assistance of counsel. In the context of defendant's issue, we note that appellate "counsel on appeal has no obligation to raise every conceivable argument" and a failure to raise an issue which, in appellate counsel's judgment has no merit, fails to rise to

a level of ineffective assistance of counsel unless appellate counsel's appraisal of the issue was patently wrong. *People v. Collins*, 153 Ill. 2d 130, 140 (1992). When considering sufficiency of evidence claims, we must determine "whether, [after] viewing the evidence in the light most favorable to the State ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 28    It is the State's burden to prove beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). On review, we consider five factors when assessing the reliability of an identification. See *In re M.W.*, 232 Ill. 2d 408, 435 (2009) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). The relevant factors are:

> "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Id.* (citing *Neil*, 409 U.S. at 199-200).

"No single factor conclusively establishes the reliability of identification testimony." *People v. Lerma*, 2021 IL App (1st) 181480, ¶ 90 (citing *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22).

¶ 29    At trial, both Rafael and Christina testified that defendant was the person leaning into Rafael's passenger-side window. Rafael's testimony revealed that he was only a few feet away

11

from defendant when he leaned into Rafael's car. Rafael stated that he looked directly into defendant's eyes during the entire encounter. Rafael provided a description of the suspect to the police at the hospital almost immediately after the shooting. The description indicated that the suspect was a dark-complected Black man, who was 5'10 to 5'11 tall with a medium build and was in either his 20s or 30s. Rafael was shown a photo lineup four days after the shooting. He picked defendant's photograph and told police he was 70 to 80% certain that defendant was the person at his car. At trial, Rafael testified that he limited the certainty during the lineup because he did not think the police would believe him if he said he was 100% sure and stated he was 100% sure defendant was the man who leaned into Rafael's car.

¶ 30    Christina's testimony revealed that defendant was facing her house as he leaned on Rafael's car. Her house was 75 feet from the crime scene, and she testified that the suspect looked directly at her for between 30 seconds to a minute prior to the shooting. She identified the suspect to police immediately after the shooting indicating the suspect was a dark-complected Black male, 35 to 40 years old with a "fade" haircut. When interviewed two days later, Christina's identification further indicated that the suspect had a stocky muscular build. The record revealed that neither inclement weather, lighting, or distance interfered with her line of sight. Christina reviewed the photo lineup four days after the incident. While she identified the suspect as someone other than defendant at the lineup, she testified that her choice was limited to two of the photographs, one of which was defendant, and the two photographs were so similar she believed the men were twins. Because of her difficulty in choosing between the two photographs, Christina asserted only 60% certainty in her choice. At trial, Christina identified defendant as the person standing by Rafael's car and explained that seeing him in person was different than looking at photographs because she could see his entire body.

12

¶ 31    "[A] positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007) (citing *People v. Vriner*, 74 Ill. 2d 329, 343 (1978)); see also *In re M.W.*, 232 Ill. 2d at 435. "As a general proposition, it can be said that discrepancies and omissions as to facial and other physical characteristics are not fatal, but simply affect the weight to be given the identification testimony." *People v. Slim*, 127 Ill. 2d 302, 308 (1989). Here, we have two witnesses identifying defendant as the person who stood at, and leaned into, the passenger-side window of Rafael's car. Their descriptions of the suspect immediately following the incident were nearly identical. Both Rafael and Christina looked at the suspect's face for a substantial amount of time and neither experienced any potential disability in viewing the suspect from weather, distance, or time. While there were discrepancies between whether the suspect wore glasses or had facial hair, neither witness attributed the suspect with either feature during their initial interviews. Both witnesses reviewed a photograph police lineup four days after the shooting. Rafael chose defendant. Christina narrowed the lineup to two photographs, one of which was defendant. While she ultimately chose the other photograph, Christina explained that the men looked so similar she believed them to be twins.

¶ 32    Our consideration of the five factors leads us to conclude that Rafael and Christina's testimonies were sufficiently reliable for the jury to conclude that defendant was the person leaning into Rafael's car at the time of the shooting. Our review of the remaining collateral evidence, which places all reasonable inferences in favor of the State's evidence (see *People v. Newton*, 2018 IL 122958, ¶ 24), is equally unavailing to defendant. That evidence, and the inferences attached thereto, confirms that defendant was in the immediate vicinity of the shooting, the shooter could only be the person leaning into Rafael's car, and defendant's actions after the shooting that included text messages, avoidance of his parole officer, and an internet search query of "police

13

scanner in my area" were indicative of his consciousness of guilt. Reviewing the evidence in a most favorable light to the State, we conclude that a rational jury could convict defendant of attempted first degree murder and also conclude that sufficient evidence was submitted to show that defendant used the firearm in the offense.

¶ 33 As noted above, appellate counsel is not obligated to brief every conceivable issue on appeal and a failure to raise an issue which, in appellate counsel's judgment has no merit, fails to rise to a level of ineffective counsel, unless appellate counsel's appraisal of the issue was patently wrong. *Collins*, 153 Ill. 2d at 140. Here, we cannot find that appellate counsel's appraisal was patently wrong because raising the sufficiency of the evidence argument on direct appeal had no merit. Defendant cannot show that appellate counsel's decision not to raise the issue on appeal was deficient and therefore, we deny defendant's claim of ineffective assistance by appellate counsel.

¶ 34                                          B. Actual Innocence

¶ 35 Defendant also contends that the trial court's second stage dismissal of his postconviction petition was erroneous because he presented a colorable claim of actual innocence. "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive that it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96; see also *People v. Sanders*, 2016 IL 118123, ¶ 24.

¶ 36 For the evidence to be considered "new," it must be "discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Noncumulative means the evidence adds to what the jury heard," "[a]nd conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* Well-pleaded facts stemming from the new evidence that are not positively rebutted by the record are taken as true and credibility rulings regarding the new evidence are prohibited at the

14

second stage of proceedings. *Sanders*, 2016 IL 118123, ¶ 42. "[T]he conclusiveness of the new evidence is the most important element of an actual innocence claim." *Id.* ¶ 47. We review the dismissal *de novo*. *Id.* ¶ 31.

¶ 37    Defendant's evidence was based on Harry Hawkins's written statement that was notarized on November 30, 2023. The written statement was not an affidavit as required by section 122-2 of the Act. See 725 ILCS 5/122-2 (West 2024). An affidavit is " 'a declaration, on oath, in writing, sworn to by a party before some person who has authority under the law to administer oaths.' " *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 493 (2002) (quoting *Harris v. Lester*, 80 Ill. 307, 311 (1875)). "The purpose of the section 122-2 affidavit requirements is to show that the defendant's allegations can be objectively and independently corroborated." *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 16. While the lack of corroboration in an affidavit is irrelevant at the first pleading stage, "the State may challenge this nonjurisdictional procedural defect at the second stage of the proceedings," and if the affidavit is inadequate, "the court may dismiss the petition upon the State's motion." *People v. Allen*, 2015 IL 113135, ¶¶ 34-35. Here, the written statement is not an affidavit because it was not sworn on oath. This defect alone suffices as a basis for dismissal.

¶ 38    However, even if the statement could be considered "other evidence" under section 122-2 of the Act, it must still represent "new, material, [and] noncumulative evidence that is so conclusive that it would probably change the result on retrial." *Coleman*, 2013 IL 113307, ¶ 96. Nothing in defendant's postconviction petition or affidavit indicated whether Hawkins's statement was new and unknown to the defendant at the time of the trial, or whether the information could not have been obtained with due diligence prior to the trial. At the hearing on the State's motion to dismiss, defense counsel conceded that nobody knew Hawkins but argued that it did not matter

15

because the statement was considered true and a third stage proceeding was required to determine Hawkins's credibility and delve more deeply into what he saw.

¶ 39 On appeal, defendant contends that Hawkins was unavailable at the time of the trial and unknown to defendant as a witness. However, defendant's citation for these alleged facts fails to support the contention, as neither Hawkins's unavailability prior to trial, when he became known as a witness, or why his statement could not have been obtained with due diligence were addressed by defense counsel at the hearing. As such, there is nothing to support the required element of "new evidence" and this failure is a second sufficient basis for dismissal. See *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 28.

¶ 40 However, even if we ignore the lack of an actual affidavit and the lack of evidence regarding whether the evidence was new, and presume the evidence was cumulative and material, the lack of conclusiveness in Hawkins's statement fails to support an actual innocence claim. The evidence must be "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 41 Nothing in Hawkins's statement places the trial evidence in a different light, undermines the jury's conviction, or the jury's finding that defendant was the shooter. See *Coleman*, 2013 IL 113307, ¶ 97. First, Hawkins's statement reveals that he was substantially farther from the incident than Christina and Rafael. Hawkins's statement indicated that he was over a block away from the incident as compared to the 75 feet between Christina's house and Rafael's car or the "few feet" between Rafael and defendant comprised solely of the width of the passenger seat in Rafael's car.

¶ 42 Second, Hawkins's statement concedes that he did not see the shooter. This statement is similar to those provided by Rafael and Christina and therefore fails to undermine the jury's prior conclusions based on the same fact.

16

¶ 43　　Third, Hawkins's statement appears to focus on the actions of a man whom he refers to as "One" but never states that "One" was defendant. However, even if we presume "One" was defendant, Hawkins's statement places "One" on the passenger side of Rafael's vehicle before the gunshots and no evidence was submitted that disputed the shooting occurred inside Rafael's car.

¶ 44　　Finally, the fact that someone other than defendant ran away from the scene holding a gun is equally unavailing. More than one person may have had a gun during the incident. Further, even if only one gun was at the scene, defendant could have provided the weapon to the short, stocky person after the shooting. As such, this allegation also fails to undermine the jury's conclusions.

¶ 45　　Therefore, accepting Hawkins's statements are true, we cannot find the allegedly "new" evidence so conclusive that it would change the result on retrial. *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Accordingly, we affirm the trial court's dismissal of defendant's postconviction petition claim of actual innocence.

¶ 46　　　　　　　　　　　　　III. CONCLUSION

¶ 47　　For the above-stated reasons, we affirm the trial court's dismissal of defendant's postconviction petition.

¶ 48　　Affirmed.